United States District Court
Middle District of Florida
Fort Myers Division

CYNTHIA ELIZABETH BARNES,

     *Plaintiff,*

v.                                     **NO. 2:18-cv-312-FTM-38PDB**

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

---

## Report & Recommendation

This is a case under 42 U.S.C. § 405(g)[1] to review a final decision of the Commissioner of Social Security denying Cynthia Barnes's claim for disability-insurance benefits. Barnes seeks vacatur and remand on three asserted grounds: (1) the Administrative Law Judge ("ALJ") erred at step two of the five-step sequential process by finding her mental impairments non-severe; (2) the ALJ erred at the same step by finding her physical impairments non-severe; and (3) the ALJ violated her constitutional due process rights by relying on evidence outside the record. Doc. 22. The Commissioner contends Barnes shows no error warranting relief. Doc. 26.

## I.    Framework

The Social Security Administration ("SSA") uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906. If dissatisfied with that determination, the claimant

---

[1]Unless otherwise indicated, legal citations are to the statutes and regulations in effect on July 11, 2014, when Barnes filed her claim.

may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an ALJ. 20 C.F.R. §§ 404.929−404.943. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982. If the Appeals Council denies review, the claimant may sue in federal district court seeking review of the ALJ's decision. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

To obtain benefits, a claimant must demonstrate she is disabled. 20 C.F.R. § 404.1512(a). A claimant is disabled if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must show disability by the date last insured. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

To decide whether a person is disabled, the SSA uses a five-step sequential process, asking (1) whether she is engaged in "substantial gainful activity,"[2] (2) whether she has a severe impairment or combination of impairments, (3) whether the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1,[3] (4) whether she can perform any of her "past

---

[2] "Substantial gainful activity" is "work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* "Gainful work activity" is work done "for pay or profit." *Id.*

[3] In the Listing of Impairments, "for each of the major body systems," the SSA describes "impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). The Listing of Impairments is structured to match the definition of "disability," which "includes two limiting elements: a definition of impairment and a severity requirement." *Randall v. Astrue*, 570 F.3d 651, 657 (5th Cir. 2009) (citing 42 U.S.C. § 423(d)(1)(A)). If a claimant meets or equals an impairment in the Listing of Impairments, she is "conclusively presumed to be disabled and entitled to benefits." *Bowen*, 476 U.S. at 471.

relevant work"[4] given her "residual functional capacity" ("RFC"),[5] and (5) whether there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). If the SSA finds disability or no disability at a step, it will "not go on to the next step." 20 C.F.R. § 404.1520(a)(4).

## II.    Overview

Barnes was born in 1958. Tr. 193. She completed twelfth grade, Tr. 245, and has worked as a residential real estate agent, bank worker, child-care worker, data-entry worker, and teacher's aide, Tr. 246.

Barnes was insured to March 31, 2008. Tr. 12, 203. She applied for benefits on July 11, 2014, alleging she had become disabled on June 1, 2005, Tr. 193, from a nervous breakdown, depression, lethargy-malaise, anxiety, panic attacks, borderline personality disorder, post-traumatic stress disorder ("PTSD"), fibromyalgia, and osteoarthritis, Tr. 77, 244. The relevant period is June 1, 2005 (the alleged onset date), to March 31, 2008 (the date last insured). Tr. 12, 13, 193, 203.

Barnes failed at each level of the administrative process. Tr. 84–85 (initial disability determination by state agency), 86–87 (reconsideration determination by state agency), 7–28 (decision by ALJ), 1–6 (action by Appeals Council).

---

[4]"Past relevant work" is "work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. § 404.1560.

[5]A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1).

### III.   Evidence[6]

### A.   *Records Before the Alleged Onset Date of June 1, 2005*

In July or August 2004, Barnes received treatment at the Southern Chester County Family Practice Associates Clinic for depression and fatigue. Tr. 783–85. Her medication (Lexapro) was left unchanged, and she was advised to check back in six months. Tr. 785.

In November 2004, Barnes was treated at Feeney Chiropractic Care Centre for bilateral hand pain and "neck pain radiating down the arm and into the middle and ring fingers on the right hand" due to a recent incident while walking her dog, and for "mild back pain" from a 1995 car accident. Tr. 772. Her physical examination was mostly normal, and she was recommended for chiropractic treatment and a rehabilitation exercise program. Tr. 773–75.

In January 2005, Barnes called Southern Chester to report continued "burning, tingling, numbness in both hands and problems with shoulders and arms" despite ongoing chiropractic care. Tr. 280–82, 782–83. A few days later, she had an appointment there and was advised to get an EMG of her upper extremities. Tr. 281.

In February 2005, Barnes got an EMG at Brandywine Valley Neurology Clinic, which indicated she had bilateral carpal tunnel syndrome. Tr. 293–95, 769–70. A week later, she returned to Southern Chester to discuss the carpal tunnel syndrome and continued cervical-spine pain, which was radiating to her arms and hands. Tr. 771. She was scheduled for carpal tunnel surgery on March 4, 2005, but expressed a desire to "avoid this if possible." Tr. 771.

---

[6]Only the medical records necessary to understand and evaluate Barnes's arguments are summarized here. Additional summaries are in the ALJ's opinion, Tr. 10–22, and the parties' briefs, Docs. 22, 26.

Beginning in February 2005, Barnes obtained chiropractic care from Jessica Bohl, D.C. Tr. 767–68.

In March 2005, Barnes returned to Southern Chester and reported progress with her neck pain due to the chiropractic care, a fifty to sixty percent improvement in her carpal tunnel syndrome, and a twenty to thirty percent improvement in her bilateral grip strength. Tr. 795. The assessment was that Barnes had shown improvement, had "responded well to conservative care," and should continue chiropractic care and trigger-point therapy. Tr. 795–96.

In May 2005, Barnes returned to Southern Chester and reported that her counselor "strongly feels" she should stay on her medication (Lexapro) and that her neck was "doing better" and is "improving." Tr. 278, 780. Her mental and physical examination showed no abnormal findings. Tr. 279.

## B.  *Records After the Alleged Onset Date of June 1, 2005*

To September 2005, Barnes continued to obtain chiropractic care from Bohl. Tr. 767–68.

In December 2005, Barnes was treated at the Health Care Center at Christiana, where she reported treatment for borderline personality disorder by Judith Willets, Ph.D., stating that treatment was no longer working, that she had gained thirty pounds in three years, and that she was having difficulty concentrating and finishing projects. Tr. 269. There were no abnormal medical findings. Tr. 270, 809.

From January to June 2006, Barnes met regularly with Dr. Willets at the Pike Creek Psychological Center to treat depression and anger, and she was consistently diagnosed with depression and borderline personality disorder. Tr. 379–91. Dr. Willets found that Barnes's symptoms of depression decreased on four occasions (Tr. 380–82, 386, 391), increased on five occasions (Tr. 379–80, 383, 390), and had no

5

change on eleven occasions (Tr. 379–82, 384–86, 389, 391). Dr. Willets labeled Barnes's prognosis as "improvement" on five occasions (Tr. 381, 384, 386, 391), "fluctuating" on eleven occasions (Tr. 379–83, 385, 390–91), and "guarded" on four occasions (Tr. 379, 382, 386, 389).

In August 2006, after moving to Florida, Barnes sought initial treatment at the Harbor Cardiology and Vascular Center. Tr. 412–15. A complete physical and psychological exam revealed no problems or symptoms and no abnormal findings concerning her musculoskeletal and neurological systems. Tr. 412–15.

In September 2006, Barnes underwent a mammogram screening. Tr. 395.

On July 31, 2007, Barnes returned to Harbor Cardiology seeking a prescription refill for Lexapro and a referral for a new psychiatrist. Tr. 443. She had a flat and apathetic affect. Tr. 443.

In September 2007, Barnes underwent another mammogram screening. Tr. 394.

## C.   *Records After the Date Last Insured of March 31, 2008*

In August and November 2008, Barnes returned to Harbor Cardiology, with no notable findings. Tr. 440–44.

In November 2008, Barnes underwent another mammogram screening. Tr. 401.

In January 2009, Barnes underwent imaging tests for sinusitis and abdominal pain. Tr. 397–99.

In August 2014, Sally Rowley, Psy. D., a non-examining psychological consultant, opined, based on the evidence to date, Barnes's mental impairments had been non-severe but her osteoarthritis and allied disorders had been severe during

the relevant period (June 1, 2005, to March 31, 2008) and Barnes had not been disabled during the relevant period. Tr. 79, 81–82. But she also stated, "There is insufficient evidence to substantiate the presence of a disorder," and, "There is insufficient evidence to evaluate the claim." Tr. 81–82.

In September 2014, Usha K. Nandigam, M.D.—apparently Barnes's primary care physician in Florida, Tr. 394, 469, 472, 481, 504—completed a medical source statement providing opinions about Barnes. Tr. 516–18. She stated Barnes had been treated over the last eight years at her office for depression and panic attacks. Tr. 517. She opined Barnes was limited to one-third of a workday in her ability to concentrate, follow simple instructions, carry out simple instructions, understand simple instructions, use judgment, respond to supervision, respond to coworkers, respond to usual work situations, and deal with changes in a routine work setting. Tr. 517. She wrote she was "unable to assess" Barnes's postural limitations, manipulative limitations, and need to take breaks during the day; she expressed no opinion on Barnes's exertional limitations, visual limitations, and non-exertional limitations; and she expressed no opinion on whether Barnes had limitations due to a mental impairment. Tr. 517. She stated no opinion on whether Barnes had been disabled from substantial work from at least June 1, 2005. Tr. 517.

In July 2016, Majd Alsamman, M.D., at Charlotte Behavioral Health completed three "mental disorders" forms for Barnes, indicating he had treated or examined her on June 30, 2016, and checking boxes next to statements that his opinions were provided within a reasonable degree of medical certainty and that Barnes's mental conditions had existed since June 1, 2005. Tr. 669–71. He found she did not meet the criteria for Listing 12.08 (personality disorder) but did meet the criteria for Listing 12.04 (affective disorder) and Listing 12.06 (anxiety-related disorder). Tr. 669–71.

Regarding Listing 12.04, Dr. Alsamman checked boxes indicating that Barnes had an affective disorder with medically documented persistence, either continuous

7

or intermittent, of depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; and thoughts of suicide "in the past." Tr. 670. He opined her disorder had resulted in a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace. Tr. 670. He opined she had a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support; and repeated episodes of decompensation, each of extended duration; and a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Tr. 671.

Regarding Listing 12.06, Dr. Alsamman checked boxes indicating that Barnes had generalized persistent anxiety experienced by motor tension and autonomic hyperactivity; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week; and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. Tr. 669. He opined her anxiety resulted in a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; and marked difficulties in maintaining concentration, persistence, or pace. Tr. 669. He opined the anxiety resulted in a complete inability to function independently outside the area of her home. Tr. 669. He checked "Yes" next to, "Has the patient's condition existed since 6/1/2005," but added, "[S]ince [patient's] been seen by me." Tr. 669. He checked "Yes" next to, "I have read the medical records before and after the onset date of disability," but added, "Available." Tr. 669.

In a mental RFC assessment, Dr. Alsamman opined Barnes suffers from "extreme" impairments in the ability to maintain attention and concentration for extended periods; to perform activities within a schedule; to maintain regular attendance; to be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to respond appropriately to changes in the work setting. Tr. 672–73. He also opined she suffers from "marked" impairments in the ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to understand and remember detailed instructions; to carry out very short and simple instructions; to carry out detailed instructions; to ask simple questions; to request assistance; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. Tr. 672–73. In a comments section, Dr. Alsamman diagnosed Barnes with severe major depression, PTSD, and generalized anxiety disorder as well as a history of back and neck injury. Tr. 673. He checked "yes" next to, "Has the patient been disabled from substantial gainful activity since 6/1/2005," but added, "since she has been seen by me." Tr. 673.

In January 2017, Dr. Alsamman wrote on a prescription form that Barnes has diagnoses of chronic PTSD, severe recurrent major depression, anxiety, and panic disorder; that she is permanently disabled and has been disabled since 2000; and that she continues to have symptoms and receive medications and therapy. Tr. 868.

## IV.    ALJ's Decision

The ALJ conducted a hearing on January 12, 2017, Tr. 47–76, and issued a decision on May 17, 2017, Tr. 7–28.[7]

At step one, the ALJ found Barnes had not engaged in substantial gainful activity during the relevant period (June 1, 2005, to March 31, 2008). Tr. 13.

At step two, the ALJ found that Barnes, through the date last insured (March 31, 2008), had had "medically determinable impairments" of "cervical/dorsal myositis, osteoarthritis, radiculitis and myalgia, bilateral carpal tunnel syndrome, depressive/adjustment and personality disorders." Tr. 13. The ALJ further found that Barnes, through the date last insured (March 31, 2008), had not had "an impairment or combination of impairments" that had "significantly limited her ability to perform basic work-related activities for 12 consecutive months" and therefore had not had "a severe impairment or combination of impairments[.]" Tr. 13. Having found no disability during the relevant period (June 1, 2005, to March 31, 2008) at step two, the ALJ did not proceed to the next steps. Tr. 21.

The ALJ's summary and analysis of the evidence to explain his findings spans nine single-spaced pages. Tr. 13–21. Within the analysis, he explained:

> [V]irtually no treatment occurred in the 18 months leading up to the date last insured. During this extend[ed] period without treatment, no signs or findings or episodes of worsening are documented. In addition, in the year following the date last insured, very few visits occurred with sparse clinical notes only partially legible and with no significant signs or findings apparent. Nor do the records cite physician recommendations to limit activity (exhibits 3F, 6F, 8F). Thus, the post date last insured records provide no reasonable basis to apply later signs and findings to the period on or before the date last insured.
>
> In sum, the medical evidence simply does not document the severe and

---

[7]Where, as here, the Appeals Council denies review, the ALJ's decision is the final decision for federal-court review. 20 C.F.R. §§ 404.900, 404.901, 404.981.

disabling ongoing symptoms the claimant alleges she suffered from because of her physical and mental problems during the period in question. Instead, it indicates the claimant had relatively few problems because of the same, and that they were controlled to a great extent by her medications without adverse medicinal side effects and treatment plan when they occurred. …

The evidence also indicates the claimant could follow oral and written instructions fine and needed few reminders. It also indicates she lived alone and cared for all of her own personal needs without assistance and for some of her dog's. It further indicates the claimant cooked, prepared simple meals, cleaned, performed household chores and did laundry. It goes on to indicate she navigated the internet, engaged in online activities with her computer, read and watched a lot of television. It indicates the claimant got along fine with her family members, friends, others and authority figures, and that she visited and spen[t] time with some of them on the telephone and in person on a regular basis. It also indicates she attended Bible studies and church, went out to eat with her friends and on out of state trips. It further indicates the claimant went out alone, drove, shopped, ran errands and managed all of her own personal finances without assistance. Therefore, the undersigned finds the claimant's activities of daily living were also inconsistent with her allegations of disabling physical and mental problems during the period in question as well (Exhibits [] 2E, 4E–6E, 10E, 12E–15E, 1F, 6F, 8F, 21F, 22F, 24F and Hearing Testimony).

The undersigned further notes the claimant's work history also indicated, at least to some extent, an inclination to remain out of the workforce irrespective of medical considerations during the pertinent period (Exhibits 2D–4D, 6D, 2E, 3E, 4E and Hearing Testimony). This, however, is only a minor consideration.

The reported level of difficulties during the relevant period is not entirely consistent with the evidence in the record. For instance, the claimant testified she had adverse medicinal side effects from her medications, but repeatedly advised the State agency she did not (Exhibits 5E, 6E and 10E). She testified she had a nervous breakdown during the period in question, but the evidence does not document the same (Exhibits 5E, 1F, 6F, 8F, 21F, 22F, and 24F). She testified she had significant problems concentrating and understanding things, but [the] State agency employee who assisted her when she applied for benefits noted she had no difficulty with either one of those things (Exhibit 1E). She testified she had difficulty reading and writing, but the evidence indicates she did not (Exhibits 2E, 4E–6E, 10E and 12E–15E). She testified she had difficulty using her hands because of her carpal tunnel

problems, but the evidence indicates she did not (Exhibits 2E, 4E–6E, 10E, 12E–15E, 1F, 6F, 8F, 21F, 22F and 24F). She testified she could care for all of her own personal needs without assistance, but repeatedly advised the State agency she could not (Exhibits 6E and 10E). She testified she could not lift her hair dryer over her shoulders to dry her hair, but advised the State agency she could (Exhibit 5E). She alternatively testified she was married and lived with her husband and lived alone during the period in question. She advised Dr. Willett she left her husband before her alleged onset date (Exhibits 5E, page 14, and 1F). She alternatively testified she had difficulty socializing and interacting with others and [was] isolated to a great extent, and attended Bible studies and church on a regular basis. She advised the State agency she would be hard to reach since she was going on a two-month trip to Alaska (Exhibit 3E). She testified her relationship with her family fell apart and that she did not see anyone frequently during the period in question, but the evidence reveals she lived with her aunt and uncle and advised the State agency she socialized with her friends on a regular basis (Exhibits 5E and 1F). The State agency employee who assisted her when she applied for benefits noted she was pleasant, intelligent, cooperative, well-dressed and groomed (Exhibit 1E).

In light of the inconsistencies noted above, and the ones previously noted, the undersigned finds that many of the claimant's subjective allegations are inconsistent with the objective medical and other evidence in the record.

As far as the opinion evidence is concerned, there are no medical source statements or opinions from any of the health care providers the claimant treated with during the period in question.

The undersigned gives great weight to the conclusions of Larry Meade, D.O., and Sally Rowley, Psy.D., the State agency medical and psychological consultants regarding the nature and extent of the claimant's physical and mental impairments during the pertinent period since they are consistent with the overall weight of the evidence in the record as a whole (Exhibits 1A and 4A).

The undersigned gives no weight to the opinions of Ushe Nandigam, M.D., and Majd Alsamman, M.D., regarding the claimant's ability to function during the period under consideration since they did not see or treat her during the same. In addition, they offered no meaningful explanation of how the medical history at or near the date last insured supported their assessments. Their assessments are inconsistent with the medical evidence in the record in the nearly two years before the date last insured and the year thereafter (Exhibits 3F, 6F, 8F, 10F, 18F

and 27F).

Tr. 18–20.

In analyzing the "paragraph B" criteria,[8] the ALJ stated:

> In activities of daily living, the claimant had mild restriction. She lived alone at times and cared for all of her own personal needs without assistance and for some of her dog's. The claimant cooked, prepared simple meals, cleaned, performed household chores, did laundry and went outside on a regular basis. However, the claimant's mental impairments occasionally prevented her from completing her chores in a timely manner (Exhibits 2E, 4E–6E, 10E, 12E–15E, 1F, 6F, 8F, 21F, 22F, 24F and Hearing Testimony).
>
> In social functioning, the claimant had mild difficulties. She lived with her aunt and uncle for a while and got along fine with them, other family members, friends, people and authority figures, and visited and spen[t] time with some of them on the telephone and in person on a regular basis. She also attended Bible studies and church, went out to eat with her friends and on out of state trips as well. However, the claimant's mental impairments occasionally made her nervous, anxious and/or sad, which mildly affected her ability to get along and interact with others at times, and caused her to isolate to a slight extent (Id.).
>
> With regard to concentration, persistence and pace, the claimant had mild difficulties. She could follow oral and written instructions fine and needed few reminders. The claimant navigated the internet, engaged in online activities with her computer, read and watched a lot of television. She went out alone, drove, shopped, ran errands and managed all of her own personal finances without assistance too. However, the claimant's mental impairments occasionally prevented her from completing her chores in a timely manner (Id.).

---

[8]The SSA uses "paragraph B" criteria to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C).

As for episodes of decompensation, the claimant experienced no episodes of decompensation of extended duration during the period in question, according to the evidence in the record.

Because the claimant's medically determinable mental impairments caused no more than "mild" limitation in any of the functional areas, they were non-severe[.]

Tr. 20–21.

## V.   Arguments

For her first argument, Barnes contends the ALJ erred in failing to find severe mental impairments, considering her diagnoses of depression and borderline personality disorder within the relevant period and the retrospective opinions of Drs. Nandigam and Alsamman. Doc. 22 at 13–21. The Commissioner responds Barnes presented insufficient medical evidence of her mental impairments through the date last insured (March 31, 2008) to support that her impairments were severe. Doc. 26 at 3–14.

For her second argument, Barnes contends the ALJ erred in failing to find severe physical impairments considering her carpal tunnel syndrome and fibromyalgia. Doc. 22 at 21–23. The Commissioner responds Barnes presented insufficient medical evidence of her physical impairments through the date last insured (March 31, 2008) to support her claim that her impairments were severe. Doc. 26 at 15–18.

For her third argument, Barnes contends the ALJ violated her constitutional due-process rights by giving "great weight" to the opinion of Dr. Larry Meade, a state agency medical consultant who considered Barnes's application on reconsideration because Dr. Meade's opinion is in a document outside the record. Doc. 22 at 23–24. The Commissioner responds the "allegedly deficient one-page exhibit, 4A, was in the record at the administrative proceedings (Tr. 23, *cf.* Tr. 86), and counsel voiced no

objections to the evidence at the hearing (Tr. 49)." Doc. 26 at 18–19. The Commissioner further responds Barnes shows no prejudice. Doc. 26 at 19.

## VI.    Standard of Review

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and quoted authority omitted). A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). If substantial evidence supports an ALJ's decision, a court must affirm even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

"This restrictive standard of review applies only to findings of fact," and "no similar presumption of validity attaches to the [Commissioner's] conclusions of law[.]" *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoted authority omitted).

Whether a claimant's due process rights were violated is a question of law reviewed de novo. *Milam v. Comm'r of Soc. Sec.*, 734 F. App'x 697, 699 (11th Cir. 2018) (citing *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 (11th Cir. 2000)).

## VII.   Law & Analysis

## A.    *Barnes's First and Second Arguments (Step Two Findings)*

At step two, an ALJ considers whether a claimant has a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). To be severe, an impairment must have lasted or be expected to last for a continuous period of at least

15

twelve months. 20 C.F.R. § 404.1509.

"An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). In other words, an impairment or combination of impairments is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *accord* Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1 (July 2, 1996).[9]

At step two, the claimant bears the burden of showing an impairment is severe. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). "Step two is a threshold inquiry." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). It is "a reasonable administrative convenience designed to screen out groundless claims." *Stratton v. Bowen*, 827 F.2d 1447, 1452 (11th Cir. 1987). Only "the most trivial impairments" are rejected because a "claimant's burden at step two is mild." *McDaniel*, 800 F.2d at 1031. Still, the "mere existence" of an impairment does not show its effect on the claimant's ability to work. *Moore*, 405 F.3d at 1213 n.6.

Here, even considering the mild burden, Barnes shows no error in the ALJ's findings at step two that she had no severe mental or physical impairment during the relevant period (June 1, 2005, to March 31, 2008). The ALJ gave no weight to Drs. Alsamman's and Dr. Nandigam's retrospective opinions, Tr. 20, and, without them, as the ALJ found, the evidence is scant.

---

[9]SSRs are agency rulings published under the Commissioner's authority and binding on all components of the Social Security Administration. *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990). They are not binding on a court but may be entitled to great respect and deference. *B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. Unit B. 1981); *see Stein v. Reynolds Sec. Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (Eleventh Circuit is bound by decisions issued by Unit B panels of the former Fifth Circuit).

On the mental impairments, while Dr. Willets diagnosed Barnes with depression and borderline personality disorder during the relevant period (June 1, 2005, to March 31, 2008), the severity of the impairments was not discussed, and the "mere existence" of impairments is insufficient to establish their severity or their effect on ability to work. *See Moore*, 405 F.3d at 1213 n.6 (quoted). The records show Barnes addressed the impairments before and during the relevant period with medication (Lexapro) and counseling. *See* Tr. 785 (August 2004; Lexapro prescription unchanged), Tr. 278, 780 (May 2005; counselor's belief Barnes should continue on Lexapro), Tr. 379–91 (January to June 2006; counseling with Dr. Willets with notes of improvement or "no change" for thirteen of twenty sessions), Tr. 412–14 (August 2006; psychological examination indicating no problems), Tr. 443 (July 2007; refill of Lexapro).

On physical impairments, in November 2004, the year before the relevant period (June 1, 2005, to March 31, 2008), a physical examination as part of Barnes's treatment for hand and neck pain (due to the dog-walking incident) indicated largely normal results, and she was recommended for chiropractic treatment and a rehabilitation exercise program. Tr. 772–75. Although she was diagnosed with carpal tunnel syndrome,[10] Tr. 293, 769–70, she avoided surgery for that condition, Tr. 771. Her chiropractic care from February to September 2005, Tr. 767–68, led in March 2005 to progress with her neck pain, a fifty to sixty percent improvement in her carpal tunnel syndrome, and a twenty to thirty percent improvement in her bilateral grip strength, Tr. 795. She had "responded well to conservative care," and was advised merely to continue chiropractic care and trigger-point therapy. Tr. 795–96. At all three appointments in August 2005—the last month of chiropractic treatment with Bohl—she reported neck and arm pain as either a 1 or 2 out of 10. Tr. 768. Physical examinations in May and December 2005 indicated no abnormal objective medical findings. Tr. 269–70, 278–79, 809. After her move to Florida in August 2006, a

---

[10]At the hearing, Barnes testified that her primary physical problem was her back, not her hands. Tr. 67.

physical examination indicated no abnormal findings on her musculoskeletal and neurological systems. Tr. 412–14. Further care in August and November 2008 also indicated no physical abnormalities.[11] Tr. 440–44. The record is devoid of any physician recommendations to avoid physical activity. Tr. 18. Besides the discussion of the medical evidence, the ALJ considered Barnes's lack of work history and "level of daily activities" inconsistent with severe physical impairments (caring for personal needs, feeding and walking dog, cooking, cleaning, doing laundry, using the computer, going out alone, driving, and shopping). Tr. 19, 20, 317–20, 412, 809.

Within her first and second arguments concerning the ALJ's step-two findings, Barnes makes seven sub-arguments.

First, Barnes argues the ALJ should have given Dr. Alsamman's and Dr. Nandigam's retroactive opinions substantial weight.[12] Doc. 22 at 14–16, 18–19.

Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c).[13] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still

---

[11]At the hearing, Barnes explained that, in 2007 and 2008, she did not have many in-depth conversations about her situation with her treating source at Harbor Cardiology because she was "too embarrassed" and did not give the depth of information that she had testified to at the hearing. Tr. 71.

[12]Barnes references but does not argue she meets Listings 12.04 or 12.06 based on Dr. Alsamman's July 2016 opinion. Doc. 22 at 14–15. That argument would fail. Substantial evidence supports the ALJ's rejection of Dr. Alsamman's opinion. Moreover, as the Commissioner observes, Doc. 26 at 11–12, information Dr. Alsamman checked on those Listings sheets was demonstrably inconsistent with medical evidence in the record. *Compare* Tr. 671 (opining Barnes had repeated episodes of decompensation) *with* Tr. 491 (denying hospitalizations for mental illness); *and compare* Tr. 669 (opining Barnes had a "complete inability to function independently outside the area of one's home") *with* Tr. 317–20 (detailing functionality).

[13]"For claims filed … before March 27, 2017, the rules in [20 C.F.R. § 404.1527] apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply." 20 C.F.R. § 404.1527.

18

do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

The SSA generally will give more weight to the medical opinions of "treating sources"[14] because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2) (2017). Factors to decide the weight to give a medical opinion include the examining relationship, the treatment relationship, supportability, consistency, and specialization.[15] 20 C.F.R. § 404.1527(c) (2017).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). An ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240–41. "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

---

[14]A "treating source" is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. § 404.1527(a)(2) (2017).

[15]An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011).

"[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

Barnes shows no error in the ALJ's treatment of Dr. Alsamman's and Dr. Nandigam's retroactive opinions. As required, the ALJ stated the weight he was giving their opinions ("no weight") and explained why (they "did not see or treat" Barnes "during the period under consideration" and "offered no meaningful explanation of how the medical history at or near the date last insured supported their assessments," which were "inconsistent with the medical evidence in the record in the nearly two years before the date last insured and the year thereafter").

Those reasons constitute good cause, *see Phillips*, 357 F.3d at 1240, and substantial evidence supports them. The record does not include notes or findings about Barnes from the doctors within a year before or after the relevant period (June 1, 2005, to March 31, 2008). Dr. Alsamman saw her only on June 30, 2016, which was years after the end of the relevant period. Tr. 668–70. Dr. Nandigam saw her more often, *see* Tr. 394, 469, 472, 481, 504, but Dr. Nandigam was "unable to assess" limitations in many areas and stated no opinion on whether Barnes had been disabled from substantial work from at least June 1, 2005. Tr. 517. And neither doctor tried to connect their respective opinion to any evidence, Tr. 516–18, 669–73. The "checkbox" forms provided insufficient support for limitations otherwise inconsistent with the medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) (unpublished) ("[C]heck-off forms … have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.") (*citing Spencer v. Heckler*, 765

F.2d 1090, 1094 (11th Cir. 1985)).

Second, Barnes observes that SSRs 96-9p and 83-10 define "occasionally" to mean occurring very little to up to one-third of the time, emphasizes that the ALJ found her mental impairments "occasionally" prevented her from timely finishing chores, and argues that the inability to timely finish chores one-third of the time "constitutes more than a minimal impairment and so is severe." Doc. 22 at 17–18.

Barnes shows no error in the ALJ's use of "occasionally." As the Commissioner observes, Doc. 26 at 12, context shows the ALJ's use of "occasionally" was colloquial and not contradictory of his other statements, *see* Tr. 20–21.

Third, Barnes points to SSR 83-20, which was in effect when the ALJ issued his decision, and observes the ALJ failed to call a medical advisor. Doc. 22 at 19–20. SSR 83-20 provided:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

SSR 83-20.

Barnes shows no error in the ALJ's failure to call a medical advisor. As the Commissioner observes, the need to an infer an onset date did not apply because the ALJ made no finding of disability. Doc. 26 at 12–13.

Fourth, Barnes argues the ALJ should have drawn no negative inference from the absence of treatment during the last 18 months of the relevant period (June 1,

2005, to March 31, 2008) without developing a record on her ability to pay. Doc. 22 at 20–21. She observes that she testified at the administrative hearing, "insurance, judge, ran out and it was self pay at that point, so no, I did not continue treatment (Tr. 54)." Doc. 22 at 20.

An ALJ may find a claimant not disabled if she fails to follow prescribed treatment "without a good reason." 20 C.F.R. § 404.1530(b). "[P]overty excuses noncompliance." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). "When [an] ALJ primarily if not exclusively relies on a claimant's failure to seek treatment, but does not consider any good cause explanation for this failure," a court must remand for further consideration. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1268 (11th Cir. 2015) (internal quotation marks omitted). But "if the ALJ's determination is also based on other factors, such as RFC, age, educational background, work experience, or ability to work despite the alleged disability, then no reversible error exists." *Id*.

Barnes shows no reversible error in the ALJ's failure to develop the record on her ability to afford treatment before drawing a negative inference from the absence of treatment during the last 18 months of the relevant period (June 1, 2005, to March 31, 2008). As the Commissioner observes, "Other than her testimony years later, [Barnes] has not pointed to any evidence in the record that she was unable to afford or obtain additional treatment for her mental impairments," Doc. 26 at 13, and, to the contrary, she had Lexapro prescriptions refilled during the relevant period and requested a referral to a psychiatrist or endocrinologist in July 2007. Tr. 443, 784. Moreover, the ALJ did not use the absence of treatment during the last 18 months of the relevant period alone as a reason to determine Barnes had no severe mental impairment during the relevant period; "the ALJ also reasonably considered the absence of severe 'ongoing symptoms' in the available treatment findings from Dr. Willets and the Harbor Center (Tr. 17–18, 19); only mild limitations … (Tr. 20–21); and the absence of episodes of decompensation." Doc. 26 at 14 (quoted).

Fifth, Barnes argues, "In assessing her failure to follow through with recommended mental health treatment, the ALJ failed to consider the impact of the mental illness itself." Doc. 22 at 21. For that argument, she observes that the district court in *Sparks v. Barnhart* stated, "Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment[.]" 434 F. Supp. 2d 1128, 1135–36 (N.D. Ala. 2006).

An ALJ may consider a claimant's failure to seek treatment. *See, e.g., Watson v. Heckler*, 738 F.2d 1169, 1173 (11th Cir. 1984). Still, as Barnes observes, some courts have recognized an unfairness in drawing a negative inference from the failure to seek treatment where there is an indication the mental impairment may have been to blame for the failure. *See, e.g., Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996); *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989). Without such an indication, courts have found no unfairness. *See, e.g., Simmons v. Colvin,* No. 2:15-CV-00631-AKK, 2015 WL 8478934, at *4 (N.D. Ala. Dec. 10, 2015) (unpublished). ("Simmons's record establishes, for all intents and purposes, that her mental health treatment and symptoms are much less extreme than the claimant's in *Sparks*, so the importance of considering the impact of the plaintiff's mental health itself is less applicable.") (internal quotation marks and alterations omitted); *Benbow v. Astrue*, No. 5:12CV17/EMT, 2013 WL 771798, at *8 (N.D. Fla. Feb. 28, 2013) (unpublished) ("[T]he record wholly fails to support Plaintiff's suggestion that her 'mental illness itself ... affected her failure to seek treatment.'").

Barnes shows no error in the ALJ's asserted failure to consider the impact of her mental illness on the treatment she obtained or failed to obtain. She points to no evidence suggesting any mental impairment affected the treatment she sought; to the contrary, as the Commissioner observes and the ALJ found, "the record reflects that she was motivated to seek treatment when necessary, requesting medication refills and a referral to a neuropsychiatrist." Doc. 26 at 14 (citing Tr. 18, 443).

Sixth, Barnes observes, "The ALJ stated that he gave great weight to the conclusions of Dr. Rowley (Tr. 20), and he did not explain why he rejected her opinion of the severity of [Barnes's] osteoarthritis and allied disorders." Doc. 22 at 22.

The regulations explain the difference between a medical consultant and psychological consultant. 20 C.F.R. § 404.1616. "The medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim." 20 C.F.R. § 404.1616(a). "The psychological consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all mental impairment(s)[.]" 20 C.F.R. § 404.1616(c). "In a case where there is evidence of both physical and mental impairments, the medical consultant will evaluate the physical impairments …, and the psychological consultant will evaluate the mental impairment(s)[.]" 20 C.F.R. § 404.1616(e).

Barnes shows no error in the ALJ's failure to explain why he was rejecting Dr. Rowley's opinion on the severity of Barnes's osteoarthritis and allied disorders. As the Commissioner observes, Dr. Rowley is a psychologist—not a medical doctor or doctor of osteopathic medicine, Doc. 26 at 17—and the ALJ's decision specifying her degree ("Psy. D.") and that she is a "psychological consultant[]" makes clear he was giving great weight to the opinions in her area of expertise. *See* Tr. 20.

Seventh and finally, Barnes cites SSR 12-2p and argues the ALJ erred in failing to consider her symptoms in determining whether she has fibromyalgia. Doc. 22 at 23.

SSR 12-2p explains that the SSA may find a person has fibromyalgia if medical evidence from an acceptable medical source shows a diagnosis that "is not inconsistent with the other evidence in the person's case record" and the evidence meets at least one of "two sets of criteria for diagnosing [it]." SSR 12-2p. The first set of criteria requires:

24

1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination (see diagram below). The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.

[and] …

3. Evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from [fibromyalgia]. Therefore, it is common in cases involving [fibromyalgia] to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor).

SSR 12-2p (Section II.A). The second set of criteria requires:

1. A history of widespread pain;

2. Repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded (see section II.A.3).

SSR 12-2p (Section II.B). The SSA emphasizes, "we need objective medical evidence to establish the presence of" fibromyalgia. SSR 12-2p.

Barnes shows no error in the ALJ's failure to address the criteria in SSR 12-2p. As the Commissioner observes, she points to treatment notes stating only a diagnosis of fibromyalgia, and the treatment notes are from 2009, which is after the

relevant period (June 1, 2005, to March 31, 2008). SSR 12-2p did not require the ALJ to do more than the ALJ did.

In short, although a claimant's burden at step two is mild, *see McDaniel*, 800 F.2d at 1031, substantial evidence supports that Barnes failed to satisfy that burden, particularly considering that an impairment must significantly limit one's ability to do basic work activities for a continuous period of at least twelve months, *see* 20 C.F.R. §§ 1509, 404.1522(a) 20 C.F.R. § 404.1509, and the restrictive standard of review, *Martin*, 894 F.2d at 1529.

Remand for a new step-two analysis is unwarranted.

## B.     *Barnes's Third Argument (Due Process)*

The provision of benefits is subject to the guarantees of due process of law under the Fifth and Fourteenth Amendments of the United States Constitution. *See generally Goldberg v. Kelly*, 397 U.S. 254 (1970); *Mathews v. Eldridge*, 424 U.S. 319 (1976); Program Operations Manual System ("POMS") DI 40515.010.[16] Due process constrains governmental decisions that deprive individuals of property (including disability benefits) and requires "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 332−33 (internal quotation marks omitted).

Where a due process violation has occurred, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded … for further development of the record." *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997); *see, e.g., Vangile v. Comm'r, Soc. Sec. Admin.*, 695 F. App'x 510, 513 (11th Cir. 2017) (holding in the alternative that remand was unwarranted because the claimant failed to show how

---

[16]The POMS contains "publicly available operating instructions for processing Social Security claims." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003).

any error by the ALJ prejudiced him); *Carter v. Colvin*, 597 F. App'x 501, 503 (10th Cir. 2015) (holding in the alternative that remand was unwarranted because the claimant failed to say what she would have done differently). A court "should be guided by whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" *Graham*, 129 F.3d at 1423 (quoted authority omitted). "Generally, there is no prejudice when there is 'sufficient evidence' in the record that allows the ALJ 'to make an informed decision.'" *Brock v. Comm'r, Soc. Sec. Admin.*, 758 F. App'x 745, 748 (11th Cir. 2018) (quoting *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1269 (11th Cir. 2007)).

Barnes's argument concerns Exhibit 4A. At the hearing, the ALJ asked Barnes's counsel if he had any objections to the evidence, and he responded, "No, sir." Tr. 49. The ALJ admitted the exhibits, which included Exhibit 4A. Tr. 50. In the decision, the ALJ cites Exhibit 4A as the opinion of Dr. Meade (the state agency medical consultant), explains Dr. Meade and Dr. Rowley (the state agency psychological consultant) provided opinions about the "nature and extent of [Barnes's] physical and mental impairments during the pertinent period," and states he is giving both opinions "great weight" because "they are consistent with the overall weight of the evidence in the record as a whole." Tr. 20. In the exhibit list attached to the ALJ's opinion, the ALJ describes Exhibit 4A as the "Reconsideration Disability Determination by State Agency, Title II," and explains it is one page. Tr. 23. In the record itself, Exhibit 4A is a one-page "Disability Determination and Transmittal." Tr. 86. The record does not include the detailed reconsideration explanation, but did include the summary reconsideration explanation:

> We have determined that your condition was not disabling on any date through 03/31/2008, when you were last insured for disability benefits. In deciding this we considered the medical records, your statements, and how your condition affected your ability to work. You state that you are disabled and unable to work due to nervous breakdown, depression, lethargy, malaise, anxiety, panic attacks, borderline personality disorder, post traumatic stress disorder, fibromyalgia, and osteoarthritis. We realize that you may feel that you are disabled at this

time. However, we were unable to obtain sufficient evidence to show that your condition was disabling as of 03/31/2008, the date you last met Social Security insured status requirements. Accordingly, disability benefits cannot be established.

Tr. 87 (Exhibit 5A).

Even assuming a due process violation, Barnes does not suggest—much less show—any prejudice caused by the absence of Dr. Meade's opinion.[17] *See generally* Doc. 22 at 23–24. Nor does the record show prejudice. Exhibit 4A, which is in the record, indicates Dr. Meade affirmed the initial determination in which the SSA found insufficient evidence of physical and mental impairments during the relevant period (June 1, 2005, to March 31, 2008). Tr. 77–83.

Absent a showing of prejudice, remand based on any asserted due process violation is unwarranted.

## VIII.  Recommendation

The undersigned recommends:

(1)    **affirming** the Commissioner's decision under sentence four of 42 U.S.C. § 405(g);

(2)    **directing** the Clerk of Court to enter judgment for the Commissioner of Social Security and against Cynthia Elizabeth Barnes; and

---

[17]Barnes cites a district-court case from Alabama, explaining, "An Alabama court held that the ALJ violated claimant's due process rights by failing to give him notice of the reports upon which he relied in part for his decision. … It noted that '[d]ue process is violated when a claimant is denied the opportunity to subpoena and cross-examine those who submit medical reports.'" Doc. 22 at 23–24 (citing *Shellhouse v. Barnhart*, 395 F. Supp. 2d 1136, 1140 (N.D. Ala. 2005)). As the Commissioner explains, "[T]hat case is factually different because the ALJ sent questions to a medical expert in an *ex parte* letter, without advising the claimant of the existence of the letter before the hearing." Doc. 26 at 18.

(3)     **directing** the Clerk of Court to close the file.[18]

**Entered** in Jacksonville, Florida, on August 2, 2019.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     Counsel of Record

---

[18]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

29